IN THE UNITED STATES BANKRUPTCY COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| IN RE: | § | |
| | § | |
| GENEVA BPAX VIII, L.L.C. | § | CASE NO. 09-38376-H5-11 |
| | § | (CHAPTER 11) |
| DEBTOR | § | |

### DEBTOR'S RESPONSE TO EXPEDITED MOTION OF PMCF HOLDINGS, LLC TO DISMISS CASE

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE:**

Geneva BPAX VIII, L.L.C., Debtor in these proceedings, files this Response to the Expedited Motion of PMCF Holding, L.L.C. to Dismiss Case (the "Motion"), and in support thereof would respectfully show the Court the following:

#### FACTUAL BACKGROUND

1. Debtor is one of twenty-four tenants-in-common which together own varying undivided interests in commercial real property situated at 11150 Beamer Place, Houston, Harris County, Texas, and commonly known as the Beamer Place Apartments (the "Apartments").

2. The sponsor and organizer of this tenancy-in-common is Geneva Multi-Family Exchange VI, L.L.C. ("Exchange") whose principle is Duane Lund ("Lund").

3. As of May 2007, the Exchange owned the Apartments in their entirety. Exchange thereafter borrowed $13,027,000.00 from Prudential Mortgage Capital Company, L.L.C. ("Prudential") pursuant to a promissory note (the "Note"), and secured payment of the Note by granting to Prudential a first and prior lien on the Apartments pursuant to a Deed of Trust, as well as by further granting to Prudential a first and prior lien on all rents and other income generated from the operation of the Apartments

pursuant to a Cash Management Agreement. Lund further individually executed a guaranty (the "Guaranty") in favor of Prudential pursuant to which he personally guaranteed full repayment of the Note upon the occurrence of any of the events specified in the Guaranty.[1] Unbeknownst to Debtor and the other TiCs, however, Exchange also executed a cross-collateral agreement (the "Cross-Collateral Agreement") pursuant to which Exchange agreed that the Apartments would further serve as collateral for other debts owed by Exchange to Prudential entirely unrelated to the Apartments.

4. Subsequent to executing the above-mentioned debt instruments, Exchange sold varying undivided interests in the Apartments to twenty-three different limited liability companies, including Debtor, scattered throughout the United States from Alaska to New York. Ultimately, Exchange sold a total of approximately 75% undivided interest in the Apartments to these companies as tenants-in-common (hereinafter collectively referred to as the "TiCs"), and retained an approximately 25% undivided interest in the Apartments.

5. Although the Deed of Trust contains a "due-on-sale" clause granting Prudential the option to accelerate Exchange's indebtedness to Prudential upon sale of all or any portion of the Apartments, Lund expressly represented to each of the TiCs that Prudential's San Francisco, California office had approved the sales of undivided interests to the TiCs, and had thus waived the due-on-sale clause.

---

[1] The Note, Deed of Trust, Cash Management Agreement and Guaranty were subsequently assigned to Prudential Mortgage Capital Funding, L.L.C. which, shortly before the Apartments were posted for foreclosure, further assigned those debt instruments to movant PMCF Holdings, L.L.C. ("PMCF"). Although Exchange and Lund may have been properly notified of such assignment, neither Debtor nor the other tenants-in-common received any such notification and, thus, PMCF was omitted from the Debtor's original schedules.

6. Pursuant to the sales of these tenancy-in-common interests, each TiC (including Debtor) (a) paid to Exchange cash in an amount calculated by multiplying the TiC's undivided interest by $12,000,000 (the amount of the Apartments' purchase price), and (b) assumed a portion of the indebtedness owed to Prudential in an amount calculated by multiplying the TiC's undivided interest by $13,027,000.00.  As a result, the TiCs in combination assumed payment of a total of approximately 75% of the $13,027,000.00 indebtedness owed to Prudential by Exchange.  The TiCs are thus not only co-owners of the Apartments, but co-debtors on the indebtedness owed to Prudential.

7. Prior to the initiation of these bankruptcy proceedings, the Apartments generated sufficient income to pay Prudential all installments under the Note as such installments became due and payable.  In fact, the Apartments generated sufficient income to pay the TiCs regular monthly distributions through October 2009, in addition to the payment of the monthly installments due under the terms of the Note.

8. In September 2009, however, Exchange apparently defaulted in the payment of other, unrelated indebtedness which it owed to Prudential.  As a consequence of such default, Prudential posted the real properties securing such other indebtedness for foreclosure.  In addition, Prudential also posted the Apartments for foreclosure not because the Note was in default, but because the Apartments served as further collateral for other Exchange indebtedness owed to Prudential pursuant to the Cross Collateral Agreement.

9. In addition, Prudential exercised its rights under the Cash Management Agreement and seized control of all income generated by the Apartments, and further

replaced the Exchange-affiliated entity which was then managing the Apartments with its own selected management company.

10. As of the date of this Response, Prudential continues to collect and retain all income generated by the Apartments.

11. Upon learning of Prudential's intended foreclosure sale of the Apartments in October 2009, the TiCs formed an "Executive Committee" (the "Committee") to attempt to negotiate a restructuring of the indebtedness owing to Prudential and secured by the Apartments, and to forestall the loss of their investments in commercial real property which generates sufficient income to pay that indebtedness. Debtor is one of three members of the Committee, which represents the interests of all other TiCs save and except for Exchange.

## ARGUMENTS AND AUTHORITIES

12. Initially, PMCF makes much of Exchange's allegedly unauthorized sales of interests in the Apartments to the TiCs. But while such sales may in fact have created an event of default under the Note and Deed of Trust, PMCF has not even alleged, much less offered any proof, that as a result of those sales it accelerated the balance due under the Note.

13. Moreover, the fact that the sales may have breached the Deed of Trust's due-on-sale covenant in no manner diminishes the legitimacy of Debtor's and the other TiCs' undivided interests in the Apartments. The sales were certainly not illegal or void, but instead merely gave PMCF the option to accelerate Exchange's indebtedness.

14. PMCF further argues that these bankruptcy proceedings should be dismissed for cause pursuant to § 1112(b) of the Bankruptcy Code, and in support cites

§ 1112(b)(4)(A) and (M), as well as the factors listed in the Fifth Circuit's landmark opinion in *Little Creek Development Co. v. Commonwealth Mortgage Corp.* (*In re Little Creek Development Co.*), 779 F.2d 1068 (5th Cir. 1986).

15. At the outset, it is significant to note that PMCF does not even allege that the Apartments are subject to substantial or continuing loss while these bankruptcy proceedings are pending as required under § 1112(b)(4)(A) of the Code. Nor could PMCF make such an allegation in good faith since, as stated earlier, PMCF presently controls both the management of and the revenues generated by the operation of the Apartments. Thus, if the Apartments diminish in value during the pendency of these proceedings it will be due to PMCF's stewardship, not Debtor's.

16. The essence of PMCF's dismissal argument is its allegation that given Debtor's "minuscule" interest in the Apartments, Debtor has no realistic prospect of reorganization. But PMCF overlooks the fact that Debtor is but one of 24 TiCs which all own undivided interests in the Apartments, and all of which except Exchange are solidly in support of Debtor's efforts to save their investments in the Apartments. As co-owners (and co-debtors due to their assumption of varying percentages of the Prudential indebtedness), the TiCs together own approximately 75% of the Apartments, and will vote in favor of a plan of reorganization which equitably restructures Prudential's indebtedness.

17. Moreover, this is not the "typical" commercial property bankruptcy where the debtor's sole asset is "upside-down," and does not and foreseeably cannot generate sufficient revenues to make even minimal interest payments on the indebtedness

secured by the property. To the contrary, and as stated previously, at least through October of this year, prior to Prudential's exercise of its rights under the Cash Management Agreement, the Apartments generated sufficient revenues not only to pay all installments under the Note as they came due, but to pay distributions to the TiCs as well.[2]

18.  In short, these are highly unusual, if not entirely unique, reorganization proceedings. This case involves commercial real property owned by a number of tenants-in-common. While certainly long recognized under property law, a tenancy-in-common is not a formally recognized "unit" under the Texas Business Organizations Code and, thus, cannot initiate bankruptcy proceedings as a complete "unit."

19.  Moreover, at issue in these proceedings is income-producing property which far from being an economic disaster in fact pays for itself and then some. Unlike the vast majority of bankruptcy cases in which the debtor/owner relies upon hopes and prayers that someday on the far horizon the property will turn around and once again produce enough income just to make debt-service, the Apartments here already generate more than sufficient revenues to make full payments under the Note pursuant to its terms.

20.  Under the circumstances then, Debtor submits that successful reorganization is not only possible, but probable. This Court should thus deny PMCF's Motion, and grant Debtor the opportunity to formulate and file a plan of reorganization.

---

[2] PMCF has not yet provided Debtor or the other TiCs with any reports of the Apartments' operations since it exercised its rights under the Cash Management Agreement and took control of the Apartments. Debtor submits that it is highly unlikely that the revenues from the Apartments would have substantially declined from previous amounts received during that 30-day period.

        Respectfully submitted,
        ***FRANK, ELMORE, LIEVENS,***
        ***CHESNEY & TURET, L.L.P.***

        <u>/s/ William L. Van Fleet</u>
        William L. Van Fleet
        State Bar No. 20404750
        Jerry L. Elmore
        State Bar No. 06590000
        808 Travis, Suite 2600
        Houston, Texas 77002
        713-224-9400 Telephone
        713-224-0609 Facsimile

        ***Attorneys for Debtor***

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing instrument was served on each of the persons listed on the service list attached hereto or by ECF filing, electronic mail, facsimile or by United States first class mail on the 25th day of November, 2009.

        <u>/s/ William L. Van Fleet</u>
        William L. Van Fleet

Elizabeth Freeman, Esq.
Porter & Hedges, L.L.P.
Facsimile: 713-226-6253